# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### July 22, 2014 Session

## STATE OF TENNESSEE v. CORRIN KATHLEEN REYNOLDS

**Appeal from the Criminal Court for Knox County**
**No. 99372     Steven Sword, Judge**

_____

**No. E2013-02309-CCA-R9-CD - Filed November 12, 2014**

_____

Defendant, Corrin Kathleen Reynolds, was charged with several criminal offenses, including driving under the influence, after she was involved in a fatal car accident in Knox County. While Defendant was at the hospital being treated for her injuries, a blood sample was taken for law enforcement purposes. Defendant filed motions seeking to suppress the results of the blood analysis. After two hearings, the trial court granted Defendant's motion. The trial court and this Court granted the State's request to pursue an interlocutory appeal. After a thorough review of the record and applicable law, we determine that the record supports the trial court's conclusion that Defendant did not give actual consent to the contested blood draw. However, the record preponderates against the trial court's conclusion that Officer Strzelecki lacked probable cause to believe that Defendant had consumed alcohol. Therefore, we determine that the warrantless blood draw was proper under subsection (f)(1) of the implied consent statute because Defendant did not refuse the blood draw. Accordingly, Defendant's blood test results are not subject to suppression on the grounds argued; we reverse the trial court's grant of Defendant's motion to suppress and remand this matter for further proceedings.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Criminal Court Reversed and Remanded**

TIMOTHY L. EASTER, SP. J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, J., joined. JAMES CURWOOD WITT, JR., J., filed a separate concurring opinion.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Jamie Carter, Assistant District Attorney General, for the appellant, State of Tennessee.

Mark Stephens, District Public Defender, and Jim D. Owen, Assistant Public Defender,

Knoxville, Tennessee, for the appellee, Corrin Kathleen Reynolds.

**OPINION**

*Factual and Procedural Background*

While driving one night in October 2011, Defendant was involved in a single-car accident. Defendant and one of her passengers were injured, and the other two passengers were killed. Defendant was subsequently charged with two counts of vehicular homicide by intoxication, one count of vehicular assault, one count of reckless endangerment, one count of driving while intoxicated ("DUI") per se, and three alternative counts of DUI. Defendant filed several motions to suppress, and the trial court held two hearings. At the first hearing, held on April 5, 2013, the following proof was adduced:

Officer Lee Strzelecki of the Knox County Sheriff's Office testified that, in October 2011, he was a member of the "crash reconstruction team." On the night of October 29, 2011, he was paged[1] and given information about "a single vehicle crash with multiple occupants and . . . possibly two deceased individuals." In response, he reported to the University of Tennessee Hospital, to which the two surviving victims of the accident had been transported. He stated that approximately thirty minutes elapsed between his page and his arrival at the hospital. He explained,

> I had been in communication with the other members of the team, and I had the names of the two survivors that were transported to UT, [Defendant] and the other – the individual, and I proceeded to make contact with both of them and decide if I needed to get blood draws, and as there were two confirmed fatalities, it would have been mandatory under our investigation.

At the hospital, he found Defendant whom he described as "on a gurney waiting to be – she either was waiting to be x-rayed or came from x-ray, and she was alert and conscious and was talking to [him]." Officer Strzelecki testified that he "only was able to have a brief discussion because there was a lot of commotion in the ER, but she stated that she had been driving and that everybody in the car had been drinking." Officer Strzelecki performed a horizontal gaze nystagmus ("HGN") test on Defendant, and Defendant "exhibited all six clues" indicating that she was under the influence of a depressant such

---

[1]Officer Strzelecki did not testify about the time at which he was paged. The State subsequently filed a pleading indicating that Officer Strzelecki was dispatched at 9:07 p.m. based on dispatch records, copies of which were attached to the pleading. The Defendant does not dispute this assertion. Other undisputed documents in the record indicate that the ambulance service received information about Defendant's accident at 8:43 p.m.

as alcohol.[2]  Officer Strzelecki testified that he asked Defendant if she would submit a blood sample and that Defendant responded, "Do whatever you have to do." Approximately fifteen minutes later, a phlebotomist drew a blood sample from Defendant in Officer Strzelecki's presence.

During voir dire by defense counsel, Officer Strzelecki acknowledged that, if taken in doses that could impair, midazolam could cause the HGN test to indicate impairment. He stated that he did not know that Defendant had been given midazolam when he administered the HGN test.  He acknowledged that it was "possible" that the midazolam could have caused the HGN results.

In conjunction with Officer Strzelecki's direct testimony, the trial court admitted into evidence without objection a copy of Officer Strzelecki's curriculum vitae.  This document reflected that Officer Strzelecki was a DUI instructor for the Knox County Sheriff's Office Training Academy and DUI task force member; that he had made more than 350 DUI arrests; and that he was an instructor in standard field sobriety testing and "[a]ssist[ed] officers in better understanding the legal environment for DUI enforcement so they will become more skillful in DUI detection and deterrence."

On cross-examination, Officer Strzelecki stated that, while he was driving to the hospital, he was speaking with "several of the officers at the scene" as well as dispatch. He testified that he did not administer any *Miranda* warnings to Defendant.  Nor did he read to her the "implied consent form," explaining, "If a person consents, the procedure is we can get a blood draw.  If the person refuses, at that point the implications of the implied consent violation are read to that person, and they're given another opportunity if they want to change their mind and decide to consent."  He acknowledged that he spoke with the surviving passenger before he spoke with Defendant, and the passenger told him that Defendant had been driving.  Asked whether Defendant's consent was the reason for the blood draw, Officer Strzelecki answered, "The consent and the fact that we're – it was a double fatality.  And also I smelled the alcohol and her admission of drinking and being the driver."  He stated that he believed he had "a reasonable suspicion" that Defendant was driving while impaired.

After this initial hearing, the trial court issued a written order in which the court summarized the testimony of Officer Strzelecki.  Based on the trial court's assessment of the facts as developed at the hearing, the trial court determined Defendant gave actual

---

[2]In response to a question by the trial court, Officer Strzelecki explained that the HGN test would indicate the effects of "[a]ny kind of a depressant, like a muscle relaxer or some kind of medication that has some depressant – a central nervous system depressant in it."

consent to the blood draw. The trial court drew the following conclusions of law:

> Neither side presented much evidence or argument concerning the validity of the oral consent given by the defendant. The only evidence the court has to consider is the testimony of Officer Strzelecki, the limited value of the late filed medical records,[3] and the absence of any other proof to the contrary. Although the statement, "Do whatever you have to do" in response to being asked for a blood sample is not a specific statement of consent, the question asked was specific. The officer asked the defendant if he could take a sample of her blood. The circumstances surrounding this question and response indicate that it was a knowing and voluntary consent. The defendant continued to acquiesce in the act of taking two vials of her blood after the request. There is no indication that she ever expressed any disagreement with the officer's interpretation of the statement as consent to draw blood or asked to stop the procedure.

> The defendant relies on the medical records to show that she could not have given consent because of her injuries. However, portions of the records indicate that the defendant was alert and communicating with EMTs at the scene and in the helicopter. In addition the ER records report that she was alert there, too. She was able to communicate with the staff. Medication she had been given calmed her down and made her appear to be sleeping. However, the records indicate that by [10:25 p.m.] she was more alert and moving all extremities. The court finds that officer's testimony to be credible regarding his conversation with the defendant. Based upon her demeanor and responses to the officer, the court finds that the defendant gave oral consent to have the blood sample taken.

(Footnote added).

As to the issue of whether the Defendant had given implied consent to the blood draw, the trial court drew the following conclusions of law:

---

[3]After the hearing, the defense filed a pleading titled "Medical Records of Corrin K. Reynolds Offered in Opposition to State's Position of her Consent to a Blood Draw." Filed with this pleading were copies of eight pages of records by Rural/Metro Ambulance, six pages of records from UT Life Star, and ten pages of records from the University of Tennessee Medical Center/University of Tennessee Memorial Hospital. These records reflect diagnoses of Defendant's injuries and medications administered during and after her transport from the accident scene.

The relevant [statutory] language [of Tennessee Code Annotated section 55-10-406] is that an officer may not administer a chemical test *pursuant to this section* without reasonable grounds to believe that (1) an individual was driving under the influence, and (2) a chemical test will reveal evidence that the individual was driving under the influence. The court agrees that if the officer was relying upon this statute to obtain the blood, then he must have first had reasonable grounds. However, the court finds that the blood draw was not conducted pursuant to this section. The blood was taken pursuant to a completely separate consent expressly given by the defendant, as stated above.

In sum, the trial court denied Defendant's motion to suppress upon its finding that she had given actual consent to the blood draw.[4] The trial court also stated in its order that it was "not relying on exigent circumstances in the present case."

In response to the trial court's denial of her motion to suppress, Defendant filed on July 29, 2013, another motion to suppress "due to additional medical evidence" and requested another hearing. At the second hearing, conducted on August 30, 2013, the State introduced Defendant's medical records provided by the University of Tennessee Medical Center and covering the period October 29, 2011, to November 5, 2011. These records were admitted without objection. Additionally, the following proof was adduced:

John Burr Robertson, Jr., M.D., a board-certified psychiatrist, was prepared to offer testimony "as to the capacity of [Defendant] to have given voluntary, knowing, and intelligent consent to a blood draw." In preparing to testify, he had reviewed some of Defendant's medical records, specifically those generated after the accident. Dr. Robertson testified that the ambulance report indicated that Defendant had "contusion, abrasion, head injury, fracture, [and] dislocation." The report also indicated that Defendant had "stated she could not see out of right eye" and that she was "screaming she was deaf." Her level of consciousness was "alert." Dr. Robertson agreed that Defendant's injuries were "severe."

EMS transferred Defendant to Life Star and, shortly after she was loaded onto the helicopter, Defendant was given four milligrams of morphine at 9:28 p.m. and two milligrams of midazolam (Versed) at 9:29 p.m., both drugs administered intravenously. Dr. Robertson testified about the effects of these drugs:

---

[4]In its brief, the State asserts that, in its first order, the trial court "conclud[ed] that the defendant gave both actual consent and implied consent to the blood draw." As the excerpt from the trial court's order set forth above demonstrates, that assertion is incorrect.

We can imagine she was in a lot of pain, a lot of psychological shock. She'd just had a head injury too, so she's probably a little bit out of it, just a little confused by everything.

The morphine controls pain, has a calming effect, has a euphorigenic effect, makes you feel good. The midazolam has – has a calming, disinhibiting effect so that the person is – is gentle and quiet.

Asked to clarify what he meant by "disinhibiting," Dr. Robertson continued: "Basically, the disinhibition is, you think about after you've had a couple of drinks of alcohol you might say something you normally wouldn't say, become disinhibited about what you say, what you do. Midazolam, the benzodiazepines, have similar effects to alcohol in that way." Dr. Robertson explained that the midazolam was used to enhance a patient's compliance.

Dr. Robertson testified that, according to the emergency room nurse's notes, Defendant was delivered to the emergency room at 9:35 p.m., at which time she was described as "alert" but "deaf and unable to hear verbal commands." Accordingly, "[c]ommands [were] written on paper and shown to patient." Defendant became combative and was thrashing her limbs, so medical personnel applied restraints and administered, intravenously, two more milligrams of morphine and two more milligrams of midazolam at 9:45 p.m. The emergency room nurse's notes indicated that, after the midazolam was given, Defendant "became calm and appears to be sleeping." At 9:50 p.m., five minutes later, medical personnel administered an additional two milligrams of midazolam intravenously. Dr. Robertson explained:

The midazolam is to calm her agitated state. She's really upset, really causing some difficulties there in the ER, and they need her to be compliant. They need her to do what they need her to do. They got to get her to CT, and they're going to have to get her to surgery, and they don't know about internal injuries. They've got to move fast.[5]

At 10:17 p.m., Defendant was given two more milligrams of midazolam. The contested blood draw was taken at 10:30 p.m. The following colloquy between defense counsel and Dr. Robertson ensued:

---

[5]The emergency room nurse's notes indicated that the Defendant was taken to "CT" at 10:00 p.m. and that the CT was completed at 10:25 p.m.

Q: Doctor, based on your review of these medical records and your knowledge of these medications, are you of the opinion that at any time during from [*sic*] the time of the accident until the blood was actually drawn, that [Defendant] would have been capable to give a voluntary, knowing, and intelligent and informed consent to have her blood drawn?

A: I don't think she could have.

Q: And could you tell the Court why?

A: Well, first you've got the head injury even before she has any medication, and then to the extent that she is no longer dazed and confused by such a traumatic physical injuries [*sic*] and loss of consciousness related to the head injury. Then she's got the psychological trauma of looking around and seeing people, bodies, dead and all the ambulance and the Life Star coming in picking her up. So you got all of this psychological trauma compounded on top of that, and then on the way, you've got these medications within minutes of getting – as soon as they can get an IV in, they're giving her something, and so they get the IV in, they give her some medicine to calm her down, to control the pain, and then she hits the ER, and then she's not calm enough. So – she's combative, and so they've got to give her more medication to calm her down, and each of these times they're not giving it for the heck of it, but she's getting – levels of agitation starting to go back up. The medicine's not wearing off. It's just that she requires quite a bit of medication here, and this is – this is enough to put someone down.

On cross-examination, Dr. Robertson acknowledged that he did not examine Defendant on the night in question and could "only surmise" the effects that the drugs had on her "from the medical records." He acknowledged that the EMS personnel may have been mistaken about the condition of Defendant's eyes and that the admitting emergency room doctor's records indicated that Defendant's pupils "are a size four, which are fairly small, and reactive bilaterally." The "Prior To Arrival" notes indicated that Defendant was "alert" and that she could read lips. The nurse's notes to which he had referred earlier indicated that Defendant was "more alert" at 10:25 p.m. A document titled "nursing assessments" indicated the following as of 11:30 p.m.:

Patient has a hearing aid, but refuses to put it in. Patient was cussing at the nursing staff. Administered morphine after orders were in. Will monitor. Patient arrived on – up on the floor with symptoms of intoxication. Patient

-7-

screaming to get up and use the restroom and states she is in a lot of pain. Interpreter with patient, but patient answering all of my questions. Interpreter states that he was called in, but clearly doesn't need.

When the prosecutor asked Dr. Robertson to confirm that these notes indicated that the drugs were not having much of an effect on Defendant, Dr. Robertson responded:

Well, the records during that hour of time it would show that she's – appears to be sleeping, that she gets – apparently becomes agitated again to the point they have to give her more midazolam. Then she's resting quietly. Then a few minutes later – 15 minutes later they're having to give her more midazolam. So she's kind of going in and out which is not an uncommon thing when you've had a head injury and all the psychological trauma. They don't just keep giving the midazolam if she is calm and cooperative. They're giving it because it seems to be working. Now, it's not working, we'll give her some more. They don't want to over drug her and cause respiratory suppressions. So they're trying to keep her in that twilight zone of just compliant, calm, whatever, versus getting all agitated.

Dr. Robertson then testified:

A person that received this degree of midazolam and morphine over the course of an hour would not be able to give informed consent. They would be complying – you could ask them to do anything, and they would do it. Their judgment and reasoning, their heart, cardio functioning is just they're offline.

On redirect examination, Dr. Robertson stated that the medications, administered sequentially, "would have been cumulative over that time." He also affirmed that the doses given to Defendant were "heavy."

After Dr. Robertson concluded testifying, the trial court recalled Officer Strzelecki to the stand and questioned him. Asked how he had communicated with Defendant given her hearing impairment, Officer Strzelecki responded, "She was on a gurney on her back in the ER. She was calm and alert, and when I approached her, I was standing over her. So she was on her back, and I was looking down." He did not know she was hearing impaired at the time, and Defendant responded to him verbally. He described their conversation as "very brief," and added that he "could smell alcohol on her." Asked about his conversation with Defendant before he asked if she would consent to a blood draw, Officer Strzelecki answered:

-8-

I don't recall any other specific questions. It was a very brief conversation. I was trying to determine at that point who, in fact, was the driver. I was confident that was [Defendant], but there was also another surviving passenger in the car, and in that – all that chaos we hadn't determined 100 percent who was driving. So I had talked to the – to the passenger, and he had confirmed that she was the driver. She was still back in the ER, and she had acknowledged that she was driving. I don't recall if she nodded or had said yes, but she had confirmed that she was driving, and at that point I asked if she was willing to consent to a blood draw.

Officer Strzelecki confirmed that he told Defendant who he was when he first approached her, and when the trial court asked how she responded, he testified:

Just visual [*sic*] acknowledged that somebody was speaking to her. I said, "I'm Officer Strzelecki from the Knox County Sheriff's Office. You've been in a crash. How are you doing?" And pretty much just was visually connecting eye contact between us, and the only actual sentence was the, "Do whatever you have to do," and then at that time that I was having this conversation, I was doing the horizontal gaze nystagmus test, and I observed the six clues of the horizontal gaze nystagmus.

Officer Strzelecki recalled that both of Defendant's eyes were open, that both of her pupils were equal, and that her eyes were "tracking normally." After he got Defendant's consent for the blood draw, it took about fifteen minutes for the phlebotomist to arrive. During that period, Defendant was "calm and cooperative." During the second hearing, Officer Strzelecki did not state that Defendant told him she had been drinking. On questioning by defense counsel, Officer Strzelecki agreed that his conversation with Defendant probably occurred at approximately 10:25 p.m.

After the second hearing, the trial court issued a written order containing its findings of fact and conclusions of law granting Defendant's motion to suppress the results of her blood draw. In its second order, the trial court expressly adopted its previous findings of fact "with noted exceptions." The trial court summarized the testimony of Dr. Robertson. The trial court noted specifically the additional testimony of Officer Strzelecki during which the officer testified:

[Defendant] acknowledged that she was the driver. He suspected that she might be impaired so he asked her if she would be willing to submit to a blood test. She said, "Do whatever you have to do." This was the only sentence the defendant spoke to the officer. The defendant submitted to the

blood draw and never expressed refusal.

As to the State's argument that Officer Strzelecki was authorized to require the blood draw under the implied consent statute, the trial court concluded that "[t]he circumstances of this case indicate that the officer did not have reasonable grounds to believe [Defendant] was driving under the influence. Therefore, the State cannot rely on implied consent to justify the search and seizure of [Defendant's] blood." Returning to the issue of the validity of Defendant's actual consent, the trial court concluded that while Dr. Robertson was a psychiatrist, he had "never interviewed [Defendant], reviewed any medical records of [Defendant] other than from the night of the accident, spoke with the doctors or nurses in the ER, or conducted any tests on the intelligence of [Defendant]." The trial court determined "his testimony [was] useful for the limited purpose of establishing that the medications administered to the defendant (morphine and midazolam) are designed to have a calming effect on the patient and make them more compliant." The trial court further concluded the medications taken by Defendant had an effect on Defendant but that it was "not clear to what extent the medications affected her free will and conscious thought." The trial court noted the following:

> The second description of the interaction between Officer Strzelecki and the defendant paints a different picture than the one initially presented to the court at the first hearing. The court previously believed that the defendant had a verbal interchange with the officer where she verbally answered multiple questions. The added responses from the defendant concerning the consumption of alcohol and who was driving gave the phrase, "Do whatever you have to do" more credence as an intelligent and knowing response to the request for a blood test. When asked about what was specifically said by the defendant, the officer acknowledged that the defendant only spoke one sentence during the entire brief conversation. The mere fact that the defendant non-verbally acknowledged that she was the driver gives the court much less confidence that she understood what was being asked of her when a blood sample was requested.

> The officer did not explain to the defendant that she could refuse to consent to the blood draw. Nor did he advise her that refusal to submit could result in a suspension of her driver's license. Although not required by the law in order for the consent to be valid, such advice would have gone a long way in ensuring that the consent was given from a free mind and rational intellect in this case. When she responded, "Do whatever you have to do," the officer did not provide further clarification as to what he wanted to do or why. To be clear, the court does not find that Officer Strzelecki has been

-10-

deceptive in any way in his testimony. The court finds this officer to be quite credible. However, the more specific questions asked by the court during the second hearing, along with the additional proof from Dr. Robertson, present a more complete understanding of his interaction with the defendant and her ability to comprehend this interaction.

Here, we have a defendant in a hospital after a severe car accident. She has been given multiple doses of medications designed to calm her down and make her more compliant with demands and requests. She has some degree of hearing impairment that interferes with her ability to communicate. She has a brief interaction with a police officer who asks her to follow his pen with her eyes during the HGN test. He then asks her if she was the driver. She gives a non-verbal cue indicating in the affirmative. The officer asks her for a sample of her blood to which she responds, "Do whatever you have to do." Taking all of these factors into account the court now finds that the State has failed to prove by preponderance of the evidence that this statement was a specific and intelligently given consent to have law enforcement take a sample of her blood for testing to determine possible impairment. It is just as likely that the defendant was complying with any request made of her due to the medication. Her one sentence response of acquiescence is insufficient to prove she was specifically consenting to a search of her blood.

(Citation omitted). In other words, the trial court determined that neither actual consent nor implied consent justified the warrantless blood draw. Accordingly, the trial court granted Defendant's motion to suppress.

*Analysis*

Following the trial court's ruling after the second hearing, the State sought and obtained permission to pursue this interlocutory appeal. In its brief, the State contends that the trial court erred in granting Defendant's motion to suppress because: (1) exigent circumstances supported the blood draw; (2) Defendant gave actual consent to the blood draw; and (3) the blood draw was authorized under the implied consent statute. Defendant maintains that the trial court's ruling should be affirmed.

*Standard of Review*

In reviewing a trial court's ruling on a motion to suppress, this Court will uphold the trial court's findings of fact "unless the evidence preponderates otherwise." *State v. Bell*, 429 S.W.3d 524, 528 (Tenn. 2014) (citing *State v. Climer*, 400 S.W.3d 537, 556 (Tenn. 2013)). Witness credibility, the weight and value of the proof, and the resolution

-11-

of conflicts in the proof "are matters entrusted to the trial court as the trier of fact." *Id*. at 529; *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Because Defendant prevailed in the trial court, she "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Bell*, 429 S.W.3d at 529. "However, while deference is due the trial court with respect to findings of fact, the application of the law to the facts is a question of law that appellate courts review de novo with no presumption of correctness." *Id*.

Both the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution guarantee the right to be free from unreasonable searches and seizures. Tennessee's constitutional protections regarding searches and seizures are identical in intent and purpose to those in the federal constitution. *State v. Turner*, 297 S.W.3d 155, 165 (Tenn. 2009). A blood draw conducted at the behest of a law enforcement officer for law enforcement purposes is a search subject to constitutional protection. *Missouri v. McNeely*, __ U.S. __, 133 S.Ct. 1552, 1558 (2013); *Schmerber v. California*, 384 U.S. 757, 770 (1966); *State v. Scarborough*, 201 S.W.3d 607, 616 (Tenn. 2006). "[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 630 (Tenn. 1997). Recognized exceptions to the warrant requirement include consent to search, *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973), and exigent circumstances, *Kentucky v. King*, 563 U.S. __, __, 131 S.Ct. 1849, 1856 (2011). *See State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010) (citing *State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005)). It is the State's burden to demonstrate, by a preponderance of the evidence, that a warrantless search passes constitutional muster. *State v. Harris*, 280 S.W.3d 832, 839 (Tenn. Crim. App. 2008).

*Consent*

The primary issue in this case is whether Defendant consented to having her blood drawn, either through actual consent or under the implied consent statute. *See* T.C.A. § 55-10-406.[6]

---

[6]The State alternatively argues that the warrantless blood draw was justified by exigent circumstances. However, the State did not argue exigent circumstances at either suppression hearing, and the trial court made no findings of fact relevant to exigent circumstances. Therefore, this issue is waived. *See State v. Lunati*, 665 S.W.2d 739, 749 (Tenn. Crim. App. 1983) (holding that an issue not litigated in the trial court is waived on appeal); *see also* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

*Actual Consent*

Actual consent to a warrantless search "must be 'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" *State v. Ingram*, 331 S.W.3d 746, 760 (Tenn. 2011) (quoting *State v. Berrios*, 235 S.W.3d 99, 104 (Tenn. 2007)). "Whether an individual voluntarily consents to a search is a question of fact to be determined from the totality of the circumstances." *Berrios*, 235 S.W.3d at 109. "The pertinent question is this: whether the [individual's] act of consenting is the product of an essentially free and unconstrained choice. If the [individual's] will was overborne and his or her capacity for self-determination critically impaired, due process is offended." *State v. Cox*, 171 S.W.3d 174, 185 (Tenn. 2005).

Factors relevant to evaluating the voluntariness of a suspect's consent include the suspect's awareness of her right to refuse consent; her age, education, and intelligence; and whether she was injured or intoxicated. *See State v. Waylon D. Knott*, No. M2000-02524-CCA-R3-CD, 2001 WL 846031, at *3 (Tenn. Crim. App. July 27, 2001) (citing *State v. Carter*, 16 S.W.3d 762, 769 (Tenn. 2000)); *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998)). As the United States Court of Appeals for the Sixth Circuit has recognized, "[i]t is no doubt the case that medication or intoxication may diminish the capacity to consent to the extent it undermines an individual's grasp on the reality of what he is doing" and that "in some settings, the influence of drugs, prescribed or otherwise, or the influence of alcohol may tip the balance in favor of finding a lack of capacity to consent to the search." *United States v. Montgomery*, 621 F.3d 568, 572 (6th Cir. 2010). "The burden is on the prosecution to prove that the consent was given freely and voluntarily." *State v. Blackwood*, 713 S.W.2d 677, 680 (Tenn. Crim. App. 1986).

In this case, the trial court determined that the State failed to prove, by a preponderance of the evidence, that Defendant gave actual consent for the blood draw. In reaching this conclusion, the trial court relied on the uncontroverted proof of Defendant's traumatic injuries, her hearing impairment, her very limited interaction with Officer Strzelecki, and the effects of the medications that had been administered to her to treat her injuries. While the trial court acknowledged that Dr. Robertson had not examined Defendant at the time she was under the influence of the medications, the trial court concluded that "the medication was having some effect on [Defendant]." The trial court further determined that the evidence failed to establish that Defendant sufficiently understood the nature of the request for her voluntary consent to the blood draw. Rather, it was "just as likely that [she] was complying with any request made of her due to the medication." Under our standard of review, we are unable to conclude that the evidence preponderates against the trial court's findings of fact with respect to whether Defendant gave actual consent for the blood draw. Nor do we disagree with the trial court's conclusion of law that the State simply failed to carry its burden of proving that Defendant

gave actual consent to the blood draw.

The State argues that this case is analogous to *State v. Rodney Evans*, No. E2013-00180-CCA-R3-CD, 2014 WL 1354948 (Tenn. Crim. App. Apr. 4, 2014). In that case, the defendant, a Tennessee Highway Patrol Trooper, wrecked his pickup truck and suffered a severe leg injury. Morphine and Versed were administered to the defendant. When a law enforcement officer asked the sedated defendant, "[w]ould it be okay if we take blood," the defendant "said yes." *Id.* at *2. The defendant was later charged with DUI, and he filed a motion to suppress his blood draw. At the hearing, two of the defendant's treating doctors testified that, because of the medication that had been administered to the defendant, he was not capable of consenting *to medical procedures*, specifically, the amputation of his leg. *Id.* at *4-5. The trial court denied the defendant's motion to suppress. On appeal, this Court upheld the trial court's ruling and noted that "consent for law enforcement purposes and medical purposes are based on two entirely different standards." *Id.* at *12 (citing *Ferguson v. City of Charleston*, 308 F.3d 380, 395-97 (4th Cir. 2002)); *cf. Montgomery*, 621 F.3d at 574 (finding proof supporting defendant's voluntary consent to search after being administered morphine for gunshot wounds included treating nurse's testimony that defendant remained "alert and oriented," that morphine did not affect defendant's ability to answer questions, and nurse's implementation of defendant's medical decision); *Tenn. Dept. Human Svcs. v. Northern*, 563 S.W.2d 197, 209 (Tenn. Ct. App. 1978) (determining capacity to consent to medical procedures "means mental ability to make a rational decision, which includes the ability to perceive, appreciate all relevant facts and to reach a rational judgment upon such facts" and recognizing that "[a] person may have 'capacity' as to some matters and may lack 'capacity' as to others").

In the present case, Dr. Robertson did not testify about Defendant's ability to consent to medical procedures for treatment purposes. Rather, he testified about whether she was "capable to give a voluntary, knowing, and intelligent and informed consent to have her blood drawn" at the request of a law enforcement officer. Dr. Robertson reviewed Defendant's medical records knowing that he was going to be asked to testify about her ability to give consent to the blood draw requested for law enforcement purposes, not for medical purposes. Accordingly, *Rodney Evans* is distinguishable and does not alter our analysis. We hold that the State is not entitled to a reversal of the trial court's ruling on the basis that Defendant's warrantless blood draw was supported by actual consent.

*Implied Consent*

Under Tennessee law, anyone who exercises the privilege of operating a motor vehicle "is deemed to have given consent to a test or tests for the purpose of determining

the alcoholic content of that person's blood." T.C.A. § 55-10-406(a)(1) (Supp. 2011);[7] *see State v. Humphreys*, 70 S.W.3d 752, 761 (Tenn. Crim. App. 2001) (reasoning that "anyone who exercises the privilege of operating a motor vehicle in this state has consented in advance to submit to a breath [or blood] alcohol test"). At the time of Defendant's car accident, the implied consent statute also provided, in pertinent part, as follows:

> If a law enforcement officer has probable cause to believe that the driver of a motor vehicle involved in an accident resulting in the injury or death of another has committed [vehicular homicide, aggravated vehicular homicide, or DUI], the officer shall cause the driver to be tested for the purpose of determining the alcohol or drug content of the driver's blood. The test shall be performed in accordance with the procedure set forth in this section and shall be performed regardless of whether the driver does or does not consent to the test.

T.C.A. § 55-10-406(f)(1) (Supp. 2011).[8] As this Court has held, "if probable cause exists to believe that (1) the suspect motorist has consumed intoxicating liquor and (2) evidence of the motorist's intoxication will be found if the blood is tested, it is unnecessary for law enforcement officers to obtain the voluntary consent of an individual motorist before administering a breath [or blood] test for alcohol concentration level." *Humphreys*, 70 S.W.3d at 761 (internal citations omitted).

Recently, this Court has held that "consent occurs at the point that a driver undertakes the privilege of operating a motor vehicle in the State of Tennessee, not at the point the implied consent form is read." *State v. Darryl Alan Walker*, No. E2013-01914-CCA-R3-CD, 2014 WL 3888250, at *6 (Tenn. Crim App. Aug. 8, 2014); *see Humphreys*, 70 S.W.3d at 752 ("voluntary consent is unnecessary as consent has already been obtained by the act of driving the motor vehicle upon the public roads of this state"); *but cf. State v. James Dean Wells*, No. M2013-01145-CCA-R9-CD, 2014 WL 4977356, at *13 (Tenn. Crim. App. Oct. 6, 2014) (holding that "the privilege of driving does not alone create consent for a forcible blood draw"). We have noted that "the absence of [a defendant's] subjective consent does not affect such a test's admissibility." *State v. Shirley Larhonda Gagne*, No. E2009-02412-CCA-R3-CD, 2011 WL 2135105, at *9 (Tenn. Crim. App. May 31, 2011). Generally, once consent has been given, it is effective until it is withdrawn or revoked. *State v. Cox*, 171 S.W.3d at 186 n.11; *State v. Eddie Leroy Rowlett*, No. M2011-00485-CCA-R3-CD, 2013 WL 749502, at *13 (Tenn. Crim. App. Feb. 26, 2013).

---

[7]Presently codified at T.C.A, § 55-10-406(a) (2013).

[8]Presently codified at T.C.A. § 55-10-406(d)(5)(A) (2013).

Therefore, we determine that whether Defendant gave actual consent is irrelevant, if the implied consent statute was triggered by probable cause to believe that she was driving under the influence and if the Defendant never refused the blood draw.

*Probable Cause*

The trial court determined that "[t]he circumstances of this case indicate that the officer did not have reasonable grounds to believe [Defendant] was driving under the influence" and that, therefore, "the State can not rely on implied consent to justify the search and seizure of [Defendant's] blood." The State contests this ruling on appeal, arguing that "[t]he proof established that Officer Strzelecki had reasonable grounds and probable cause to believe that Defendant was operating a motor vehicle while intoxicated and that proof of such intoxication would be shown through analysis of Defendant's blood." We agree with the State.

"The determination of probable cause is a mixed question of law and fact that we review de novo." *Bell*, 429 S.W.3d at 529 (citing *Ornelas v. United States*, 517 U.S. 690, 696-98 (1996); *State v. Davis*, 354 S.W.3d 718, 726 (Tenn. 2011)). "[P]robable cause exists when 'at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense.'" *Id.* at 530 (quoting *State v. Echols*, 382 S.W.3d 266, 277-78 (Tenn. 2012) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964))). "Probable cause must be more than mere suspicion, but it need not be absolute certainty." *Id.* (internal citations removed). Additionally, an "innocent explanation does not prevent [a court] from finding probable cause." *Id.* at 535 (citing *State v. Grier*, 791 P.2d 627, 632 n.3 (Alaska Ct. App. 1990) (stating that probable cause may be established "even though the facts known to the officer could also be reconciled with innocence")). Finally, "it matters not whether the arresting officers themselves believed that probable cause existed." *Id.* at 530 (citing *State v. Huddleston*, 924 S.W.2d 666, 676 (Tenn. 1996) ("[An officer's] subjective belief that he did not have enough evidence to obtain a warrant is irrelevant to whether or not probable cause actually existed.")).

The following facts and circumstances were known to Officer Strzelecki at the time he requested that Defendant's blood be drawn: Defendant was the driver of a car involved in a severe single-vehicle accident that resulted in two fatalities; Officer Strzelecki noticed an odor of alcohol about Defendant's person; Defendant admitted that she had been drinking, though it is unclear whether she did so verbally or nonverbally; the surviving passenger stated Defendant was the driver; and Defendant's performance on the HGN test "indicated that she was impaired." This Court has previously found probable cause when the defendant was at fault in a traffic accident and smelled of alcohol, even though his

outward behavior did not otherwise indicate that he was intoxicated. *State v.Evetts*, 670 S.W.2d 640, 642 (Tenn. Crim. App. 1984). Additionally, the Tennessee Supreme Court has found probable cause when the defendant committed a significant moving violation (driving the wrong way on a divided highway), had an odor of alcohol, and admitted to drinking, even though he was able to successfully perform field sobriety tests. *Bell*, 429 S.W.3d at 536. Under the facts of the present case, we hold that there was probable cause to believe that Defendant was operating a motor vehicle while under the influence of an intoxicant.

We note that the HGN test may have been of questionable utility for indicating that Defendant was driving while under the influence of alcohol because she had been given midazolam and morphine at the hospital. Officer Strzelecki testified that "[a]ny kind of a depressant, like a muscle relaxer or some kind of medication that has some depressant—a central nervous system depressant in it" would cause the subject's eyes to respond to the test in such a way as to indicate impairment. However, the officer was not aware that Defendant had been given midazolam prior to his administering the HGN test, and, as previously stated, an "innocent explanation does not prevent us from finding probable cause for DUI . . . in light of the other circumstances." *Bell*, 429 S.W.3d at 535. In *Bell*, the Tennessee Supreme Court found that, under the totality of the circumstances, successful completion of field sobriety tests does not alone undermine a finding of probable cause. *Id*. at 536. Therefore, even if we were to disregard Defendant's performance on the HGN test, we conclude that the other indicia of intoxication, as testified to by Officer Strzelecki, were sufficient to establish probable cause.

Accordingly, we hold that the trial court erred in concluding that Officer Strzelecki did not have probable cause to believe that Defendant was driving under the influence. Thus, under subsection (f)(1) of the implied consent statute, the officer was required to draw blood from Defendant.

*Constitutionality of Implied Consent*

On appeal, Defendant argues that the implied consent statute is invalid in light of the United States Supreme Court's decision in *Missouri v. McNeely*. *See* 133 S. Ct. at 1561 ("In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so."). This argument was not raised at the trial court level and could thereby be deemed waived. *See State v. Holton*, 126 S.W.3d 845, 862 (Tenn. 2004) (waiver could be applied to constitutional challenge to capital sentencing scheme). However, because this is a question of law that seems to be unsettled—*see James Dean Wells*, 2014 WL 4977356, at *19; *State v. Charles A. Kennedy*, No. M2013-02207-CCA-R9-CD, 2014 WL 4953586, at *13 (Tenn. Crim. App. Oct. 3,

2014)—we feel it necessary to set forth our reasons as to why we disagree with Defendant's reading of *McNeely* and find no merit in this argument.

In *McNeely*, a police officer pulled the defendant over on suspicion of DUI. The defendant refused to use a breath-test device. 133 S. Ct. at 1557. The police transported the defendant to a hospital for a blood draw. After the officer read to the defendant from the standard implied consent form, the defendant refused to consent to the blood draw. The officer nevertheless ordered the blood draw taken, and subsequent testing revealed the defendant's blood alcohol concentration to be above the legal limit. *Id.* After being charged with driving while intoxicated, the defendant filed a motion to suppress the blood test results. The trial court granted the motion on the basis that the warrantless search of the defendant's body offended the Fourth Amendment. The Missouri Supreme Court affirmed the trial court, and the United States Supreme Court affirmed the Missouri high court.

The United States Supreme Court held "that in drunk-driving investigations, the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant." *Id*. at 1568. This holding was a clarification of the *Schmerber* opinion, *see* 384 U.S. at 770-771, which many jurisdictions, including Tennessee, had interpreted as standing for the proposition that the natural dissipation of alcohol in the blood over time alone created exigent circumstances. *See, e.g.*, *Humphreys*, 70 S.W.3d at 760-61; *State v. Shriner*, 751 N.W.2d 538, 547 n.11 (Minn. 2008); *State v. Bohling*, 494 N.W.2d 399 (Wis. 1993); and *State v. Woolery*, 775 P.2d 1210 (Idaho 1989) (citing additional cases). The *McNeely* Court held that "[w]hether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances," and that the natural metabolization of alcohol is but one factor to be considered. 133 S. Ct. at 1563. As noted above, the United States Supreme Court explained that, "[i]n those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." *Id.* at 1561.

As an initial matter, we note that consent is a separate and distinct exception to the warrant requirement from exigent circumstances. *See Talley*, 307 S.W.3d at 729. The majority opinion in *McNeely* specifically limited its decision to the issue of exigent circumstances:

> Because this case was argued on the broad proposition that drunk-driving cases present a per se exigency, the arguments and the record do not provide the Court with an adequate analytic framework for a detailed discussion of

all the relevant factors that can be taken into account in determining the reasonableness of acting without a warrant.

*McNeely*, 133 S. Ct at 1568. Prior to *McNeely*'s explanation of exigent circumstances in this context, this Court routinely found statutorily implied consent to be an alternative justification for the admission of a warrantless blood draw. *See Humphreys*, 70 S.W.3d at 760-61 ("In addition to the exigent circumstances established by the nature of the evidence in cases involving intoxicated motorists, the statutorily created implied consent of the motorist permits the warrantless search of the motorist's breath or blood."); *see also Shirley Larhonda Gagne*, 2011 WL 2135105, at \*7-8; *State v. Michael A. Janosky*, No. M1999-02574-CCA-R3-CD, 2000 WL 1449367, at \*4 (Tenn. Crim. App. Sept. 29, 2000). We do not interpret *McNeely* as having any effect on the constitutionality of implied consent statutes generally.

Additionally, the plurality opinion in *McNeely* identified implied consent statutes favorably as one of a "broad range of legal tools" that States have "to enforce their drunk-driving laws and to secure BAC evidence without undertaking warrantless nonconsensual blood draws." *McNeely*, 133 S. Ct. at 1566 (J. Sotomayor, plur. op.). In that opinion, Justice Sotomayor also found it "notable that a majority of States . . . place significant restrictions on when police officers may obtain a blood sample despite a suspect's refusal (often limiting testing to cases involving an accident resulting in death or serious bodily injury)," and found no evidence that these types of restrictions "have compromised drunk-driving enforcement efforts." *Id.* at 1566-67.

Other panels of this Court examining the effect of *McNeely* on our implied consent statute have not found the statute itself to be facially unconstitutional under the circumstances presented in those cases. *See e.g.*, *James Dean Wells*, 2014 WL 4977356, at \*19; *Charles A. Kennedy*, 2014 WL 4953586, at \*13; *Darryl Alan Walker*, 2014 WL 3888250, at \*6. In both *James Dean Wells* and *Charles A. Kennedy*, this Court upheld the suppression of the blood tests, holding that Tennessee Code Annotated section 55-10-406(f)(2) (Supp. 2011)[9] did not mandate a warrantless blood draw over a defendant's express refusal.[10] By contrast, in *Darryl Alan Walker*, this Court upheld the admission of a warrantless blood draw, post-*McNeely*, finding that there was no evidence that the

_____

[9]This subsection is presently codified at T.C.A. § 55-10-406(d)(5)(B) (2013).

[10]We recognize that *James Dean Wells* held that "the privilege of driving does not alone create consent for a forcible blood draw." *James Dean Wells*, 2014 WL 4977356, at \*13. However, we are not bound by unpublished opinions of this Court. Additionally, even though the *Wells* court "decline[d] to analyze the consent exception on the basis of revocation," *id*. at \*11, we find that the refusal of consent in *James Dean Wells* is a significant distinction from the case herein, where there was no refusal of consent.

-19-

defendant refused to submit to the test being administered under subsection (f)(1). This Court held that the defendant's "implied consent remained valid, and his contention that his consent was involuntary [was] without merit." *Darryl Alan Walker*, 2014 WL 3888250, at *6. We find no support in the recent decisions of this Court for Defendant's contention that *McNeely* invalidated the mandatory provisions of the implied consent law, i.e., subsection (f)(1) in this case.

Other jurisdictions examining the effect of *McNeely* on implied consent statutes have similarly found that implied consent statutes satisfy the consent exception to the warrant requirement, so long as that consent has not been withdrawn. *See, e.g., State v. Freddie Flonnory*, 2013 WL 4567874, at *3 (Del. Super. Ct. July 17, 2013) (concluding that *McNeely* does not "prohibit[ ] courts from finding that statutory implied consent satisfies the consent requirement for the consent exception," and noting that the defendant never withdrew consent); *People v. Harris*, 170 Cal. Rptr. 3d 729, 733 (Cal. App. Dep't Super. Ct. 2014) (finding "chemical tests performed in compliance with the implied consent law satisfy the Fourth Amendment as consent searches, independently of *Schmerber-McNeely*"); *but see Aviles v. State*, __ S.W.3d __, __, 2014 WL 3843756, at *3 (Tex. App. Aug. 6, 2014) (concluding that "the statutes were not substitutes for a warrant or legal exceptions to the Fourth Amendment warrant requirement"). In California, the Appellate Division of the Superior Court recognized a "categorical[ ]" difference between a forced blood draw justified by exigent circumstances and a consensual blood draw justified by an implied consent statute, finding that "the two categories result from the two alternative avenues available to law enforcement for obtaining the evidence." *Harris*, 170 Cal. Rptr. 3d at 733 (citing *United States v. Chapel*, 55 F.3d 1416, 1419-20 (9th Cir. 1995)). Implied consent "is not invalid under the Fourth Amendment simply because it was given in advance and in exchange for a related benefit." *Id.* at 734. "[I]n light of the entire body of law as it has developed over the decades, it is no great innovation to say that implied consent is legally effective consent, at least so long as the arrestee has not purported to withdraw that consent." *Id*. Therefore, "a person who *cooperates* with a chemical test pursuant to the implied consent law has given real and voluntary consent, excusing police from obtaining a warrant." *Id*. (emphasis in original).

In the case herein, Defendant acquiesced to the terms of the implied consent law, specifically under subsection (f)(1), by obtaining a driver's license and driving on the streets and highways of Tennessee. At no time after the accident did she withdraw her consent or refuse to submit to the subsequent blood draw. We emphasize that the application of the Tennessee implied consent statute has not been held to be invalid or unconstitutional in this context—where an individual suspected of DUI, based upon

probable cause, did not refuse to submit to a chemical test.[11]   Therefore, because we determine the officer had probable cause "to believe that [Defendant,] the driver of a motor vehicle involved in an accident resulting in the injury or death of another . . . committed [DUI]" and because Defendant never refused to submit to the blood draw, the results of the blood test are admissible.  T.C.A. § 55-10-406(f)(1) (Supp. 2011).  Consequently, the trial court erred in suppressing the results on the grounds argued.  The grant of the motion to suppress is reversed.

Furthermore, if the implied consent statute were to be held unconstitutional by either the Tennessee Supreme Court or the United States Supreme Court, we believe that this would be an appropriate case for application of the good faith exception.  We recognize that Tennessee has yet to formally adopt the good faith exception to the exclusionary rule that was originally adopted by the United States Supreme Court in *United States v. Leon*, 468 U.S. 897 (1984).  *See State v. Moats*, 403 S.W.3d 170, 187 n.8 (Tenn. 2013) (citing *State v. Carter*, 16 S.W.3d 762, 768 n.8 (Tenn. 2000)); *State v. Bearden*, 326 S.W.3d 184, 188 (Tenn. Crim. App. 2010); *State v. Lonnie Taylor*, No. 86-144-III, 1987 WL 25417, at *6-10 (Tenn. Crim. App. Dec. 4, 1987); *but see State v. Clifford Deleon Thomas*, No. E2012-01956-CCA-R3-CD, 2013 WL 4725660, at *4 (Tenn. Crim. App. Aug, 30, 2013) ("In theory, there is nothing that would prevent this court from holding that an officer's good faith reliance on a facially valid ordinance was relevant to the constitutional inquiry in this particular context or upholding the seizure simply because the officer was acting reasonably under the circumstances.").  This exception, clarified in *Davis v. United States*, ___ U.S. ___, 131 S. Ct. 2419, 2430-31 (2011), and *Illinois v. Krull*, 480 U.S. 340, 349-50 (1987), pretermits application of the exclusionary rule where police officers conduct a search with an objectively reasonable good-faith belief that their conduct is lawful under binding judicial precedent or in reasonable reliance on statutes later determined to be unconstitutional.

While this Court is without authority to adopt the good-faith exception, we would be remiss if we did not take this opportunity to note that, aside from authority of the implied consent statute justifying the outcome of this case, we believe that the facts and posture of this case, in particular, seem to fit squarely within the limited exceptions to the application of the exclusionary rule set forth in both *Davis* and *Krull*.  In other words, if the implied consent statute were to be deemed unconstitutional, and if Tennessee were to adopt a limited good-faith exception to the exclusionary rule, the test results from the warrantless blood draw in this case would remain admissible because the blood draw was

---

[11]We find it particularly important to distinguish that *McNeely*, *James Dean Wells* and *Charles A. Kennedy* all dealt with defendants who had expressly refused consent for a blood draw.  *McNeely*, 133 S. Ct. at 1554; *James Dean Wells*, 2014 WL 4977356, at *7; *Charles A. Kennedy*, 2014 WL 4953586, at *1.

conducted by the officer in reasonable reliance on binding judicial precedent from this Court. The officer was in no way at fault for his good faith reliance on our numerous decisions that the implied consent statute was a constitutionally valid exception to the Fourth Amendment, which may be later overturned on the basis of the *McNeely* decision. To exclude blood test results in such circumstances as this would not serve to protect the rights of Tennessee citizens from underhanded law enforcement tactics, but would instead serve only to thwart the pursuit of justice in the wake of a tragic loss of life.

*Conclusion*

In conclusion, we determine the record supports the trial court's determination that Defendant did not give actual consent for the contested blood draw. However, the record preponderates against the trial court's conclusion that Officer Strzelecki lacked probable cause to believe that Defendant had consumed alcohol. Therefore, we determine that the warrantless blood draw was proper under subsection (f)(1) of the implied consent statute because Defendant did not refuse to submit to the blood draw. Accordingly, Defendant's blood test results are not subject to suppression on the grounds argued; we reverse the trial court's grant of Defendant's motion to suppress and remand this matter for further proceedings.

_____
TIMOTHY L. EASTER, JUDGE